712 F.2d 1248
 Teresa M. TUSA and Jean E. Tusa, Appellees/Cross-Appellants,
v.
OMAHA AUTO AUCTION INC., a Corporation, Appellant/Cross-Appellee,
Allan Studna, d/b/a Way Low Auto Sales, Cross-Appellee.
 Nos. 82-2399, 82-2414.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 14, 1983.
Decided July 21, 1983.
 
 William E. Gast, Thomas J. Jenkins, Gast & Kielty, Omaha, Neb., for appellees/cross-appellants.
 Dennis E. Martin, Daniel G. Crouchley, Dwyer, O'Leary & Martin, P.C., Omaha, Neb., for appellant/cross-appellee.
 Before HEANEY, Circuit Judge, FLOYD R. GIBSON and HENLEY, Senior Circuit Judges.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Omaha Auto Auction (OAA) appeals the finding of the district court[1] that OAA violated the odometer disclosure provisions of the Motor Vehicle Information and Cost Savings Act. 15 U.S.C. § 1981 et seq. (Disclosure Act). The Act and the regulations promulgated under its authority require a transferor to fill out a disclosure form which gives the odometer reading and certifies that it is accurate to the best of the transferor's knowledge. 15 U.S.C. § 1988 (1976); 49 C.F.R. §§ 580.1 to 580.6. OAA also complains that the attorneys' fees award of $11,926.40 to plaintiffs, Teresa and Jean Tusa, is too high. The Tusas cross-appeal, complaining that the attorneys' fees award is too low. We affirm the judgment of the district court on the issue of OAA's liability, but we reverse the part of the judgment relating to the attorneys' fees and remand the case to the district court with instructions to amend its judgment to make the attorneys' fees award $8,000.
 
 I. Facts
 
 2
 OAA runs an automobile auction which sells primarily to registered dealers. The Tusas are not dealers, but a friend of Teresa Tusa who was a registered dealer agreed to make a bid on her behalf. On July 12, 1979, Teresa and her brother Gary looked over the cars on the OAA lot. They picked out a car they liked, a 1974 Chevrolet Nova, and Gary made a successful bid of $1,800. Gary presented OAA with a money order for $1,820 (the purchase price plus a buyer's fee) and then signed documents on behalf of T & M Auto, the name of the friend's dealership. The Tusas drove off in the car that day. They started having problems with the car shortly thereafter.
 
 
 3
 The transfer of title to Teresa Tusa and her mother Jean followed an indirect path. Title went from Allan Studna (a dealer who delivered the car to the OAA premises) to OAA to T & M to Teresa and Jean Tusa. Studna, d/b/a Way Low Auto Sales, had acquired title on July 6, 1979, from Tracy Waton, d/b/a Way Low Auto Sales. The car had a Kansas title at that time. According to the odometer disclosure statement which Waton had received when he acquired title three weeks before selling it to Studna, the car had an odometer reading of 80,720 miles. When Studna delivered the car to OAA on July 12, the odometer read 60,239 miles. OAA employees recorded this mileage figure on an odometer mileage disclosure statement which had been previously signed in blank by Studna as the transferor. Apparently due to a clerical error, OAA was listed as the transferor on this form which Studna had signed and T & M was listed as the transferee. Perhaps to correct the mistake, OAA employees prepared another odometer statement on July 30 which correctly stated that Studna transferred title to OAA. Also, on July 30, OAA acquired the Kansas title from Studna, took it to the Douglas County Clerk in Nebraska, and acquired a Nebraska title. The clerk at the Douglas County office took the 60,239 mileage figure from the OAA mileage statement and put it on the Nebraska title. The acquisition of this new title was significant because, according to the district court, the mileage figure on the Kansas title had been intentionally altered by someone before OAA received it. Because of the acquisition of the new title, T & M and the Tusas did not have a chance to see that the mileage figure on the Kansas title had been changed. OAA transferred title to T & M on July 30 and T & M transferred to the Tusas on the next day. A few days later the Tusas acquired their own Nebraska title.
 
 
 4
 Waton, who had received a mileage statement with an 80,720 reading, and Studna, who delivered the car with the 60,239 odometer reading, were both named as defendants in the Tusas' complaint along with OAA. Waton could not be located and was never served. Studna failed to appear or defend and a default judgment was entered against him. The district court found OAA liable under the Disclosure Act and awarded the Tusas damages of $1,500, the minimum allowed under the Act. The court acknowledged there was no allegation that OAA itself had tampered with the odometer. The district court determined the attorneys' fees by multiplying the number of hours worked by an hourly rate below that which the court considered a reasonable rate. The court lowered the rate after considering a variety of factors, such as the difficulty of the case and awards in similar cases. OAA contests its liability on the basis that it was neither a transferor nor a transferee and that it lacked the requisite intent to defraud. Both sides appeal on the attorneys' fees issue.
 
 II. Liability of OAA
 
 5
 Section 1988 of Title 15 requires a transferor of a car to disclose mileage information to a transferee. It also authorizes the Secretary of Transportation to issue regulations imposing specific disclosure requirements. Section 1988 reads in its entirety:
 
 
 6
 (a) Not later than 90 days after October 20, 1972, the Secretary shall prescribe rules requiring any transferor to give the following written disclosure to the transferee in connection with the transfer of ownership of a motor vehicle:
 
 
 7
 (1) Disclosure of the cumulative mileage registered on the odometer.
 
 
 8
 (2) Disclosure that the actual mileage is unknown, if the odometer reading is known to the transferor to be different from the number of miles the vehicle has actually traveled.
 
 
 9
 Such rules shall prescribe the manner in which information shall be disclosed under this section and in which such information shall be retained.
 
 
 10
 (b) No transferor shall violate any rule prescribed under this section or give a false statement to a transferee in making any disclosure required by such rule.
 
 
 11
 (c) No transferee who, for purposes of resale, acquires ownership of a motor vehicle shall accept any written disclosure required by any rule prescribed under this section if such disclosure is incomplete.
 
 
 12
 Section 1988 imposes certain requirements, but it does not provide a remedy. One of the remedies provided by the Disclosure Act is contained in § 1989. This section allows for private civil actions to enforce liability for violations of odometer requirements. Section 1989(a) reads:
 
 
 13
 (a) Any person who, with intent to defraud, violates any requirement imposed under this subchapter shall be liable in an amount equal to the sum of--
 
 
 14
 (1) three times the amount of actual damages sustained or $1,500, whichever is the greater; and
 
 
 15
 (2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with reasonable attorney fees as determined by the court.
 
 
 16
 OAA contests its liability to the Tusas under § 1989 on two points. First, OAA argues that it did not violate § 1988 because that section only imposes duties on a "transferor" or a "transferee," and OAA was neither. Second, OAA argues that even if it did violate § 1988, its liability under § 1989 is limited to situations where the violation is committed with an "intent to defraud," and it had no such intent. We will treat each contention in turn.[2]
 
 
 17
 A. Status as a "Transferor" or "Transferee"
 
 
 18
 Section 1988 requires that a "transferor" disclose mileage information to a "transferee." The regulations define those terms:
 
 
 19
 "Transferor" means any person who transfers his ownership in a motor vehicle by sale, gift, or any means other than by creation of a security interest.
 
 
 20
 "Transferee" means any person to whom the ownership in a motor vehicle is transferred by purchase, gift, or any means other than by creation of a security interest.
 
 
 21
 49 C.F.R. § 580.3 (emphasis added). OAA argues that it was not a transferor or a transferee of the car because it never was the owner; when it put itself in the chain of title it was simply acting as an agent for T & M. It involved itself in the title only to facilitate the transfer from Studna to T & M. Being in the chain of title is not conclusive evidence of ownership. OAA's lack of an ownership interest can be demonstrated by considering what would have happened if OAA had tried to transfer the title to someone other than T & M. No court would have considered OAA the owner had it tried that. Because OAA could not transfer title to anyone but T & M, OAA did not have an ownership interest; OAA was merely an agent for T & M, acting for T & M's convenience. This analysis is correct to a limited extent, but it still does not absolve OAA of liability.
 
 
 22
 We refuse to accept OAA's interpretation of the terms "transferor" and "transferee." First, OAA was an owner of record. It had title to the car, and a "certificate of title of a motor vehicle is generally conclusive evidence in [Nebraska] of the ownership of the vehicle." Turpin v. Standard Reliance Insurance Co., 169 Neb. 233, 99 N.W.2d 26, 35 (1959). In Forman v. Anderson, 183 Neb. 715, 163 N.W.2d 894 (1969), the Nebraska Supreme Court held that there would not be an exception to the general rule that the title is conclusive evidence of ownership where the titleholders voluntarily put their names on the title and there was no showing of mistake of fact, coercion, or fraud. Id. 163 N.W.2d at 896. The fraud exception alluded to in Forman would apply to the hypothetical suggested by OAA in which OAA transferred title to a third party rather than delivered the title to T & M. Even though Nebraska courts would not allow a fraudulent transfer of title, Turpin and Forman make clear that Nebraska would recognize OAA's title as conclusive evidence of ownership for other than fraudulent purposes.
 
 
 23
 There was other extremely persuasive evidence of OAA's ownership: OAA's own statements. On the July 30 disclosure statement prepared by OAA employees, OAA was identified as a "transferee."[3] Also, when OAA applied for a Nebraska title it stated under oath that it was the "lawful owner or purchaser" of the car.
 
 
 24
 Second, even if evidence of ownership under state law were not so overwhelming, we would be inclined to find that OAA was an owner for purposes of the federal statute. Because we are dealing with the meaning of words in a federal statute, state law definitions of ownership are not conclusive. We must examine the statute and its purpose to determine if OAA should be considered a transferor or a transferee under § 1988. We believe that the purposes of the statute can be met only if a party in OAA's position is considered a transferor or a transferee.
 
 
 25
 The purpose of the odometer disclosure requirements is contained in the Act itself. Section 1981 reads in its entirety:
 
 
 26
 The Congress hereby finds that purchasers, when buying motor vehicles, rely heavily on the odometer reading as an index of the condition and value of such vehicle; that purchasers are entitled to rely on the odometer reading as an accurate reflection of the mileage actually traveled by the vehicle; that an accurate indication of the mileage traveled by a motor vehicle assists the purchaser in determining its safety and reliability; and that motor vehicles move in the current of interstate and foreign commerce or affect such commerce. It is therefore the purpose of this subchapter to prohibit tampering with odometers on motor vehicles and to establish certain safeguards for the protection of purchasers with respect to the sale of motor vehicles having altered or reset odometers.
 
 
 27
 The legislative history also makes clear that the Act is intended to give car buyers accurate information about the number of miles the car has traveled. The Senate Report states: "Because consumers rely upon odometer readings as an index of the condition and value of motor vehicles, title IV mandates a national policy against the disconnecting of, or the setting back of, odometers in order to defraud purchasers of motor vehicles." S.Rep. No. 413, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Ad.News 3960, 3962 [hereinafter cited as Senate Report]. Furthermore, the Act is intended to prohibit the giving of false odometer statements even by those who had nothing to do with changing the odometers. The Act states: "No transferor shall ... give a false statement to a transferee in making any disclosure required ...." 15 U.S.C. § 1988(b) (1976). This wording, added in a 1976 amendment, Act of July 14, 1976, Pub.L. No. 94-364, § 406, 90 Stat. 981, 983-84, is very similar and at least as restrictive as the original wording: "It shall be a violation of this section for any transferor ... to knowingly give a false statement." Pub.L. No. 92-513, § 408, 86 Stat. 947, 963. The Senate Report to the original bill made clear that persons who, with reasonable care, can determine that an odometer reading is false, would have to verify that the true mileage is unknown. The Report states:
 
 
 28
 This section originally allowed a person to rely completely on the representations of the previous owner. This original provision created a potential loophole, however. For example, a person could have purchased a vehicle knowing that the mileage was false but received a statement from the transferor verifying the odometer reading. Suppose an auto dealer bought a car with a 20,000 mile odometer verification but any mechanic employed by that auto dealer could ascertain that the vehicle had at least 60,000 miles on it. The bill as introduced would have permitted the dealer to resell the vehicle with a 20,000 verification. In order to eliminate this potential loophole the test of "knowingly" was incorporated so that the auto dealer with expertise now would have an affirmative duty to mark "true mileage unknown" if, in the exercise of reasonable care, he would have reason to know that the mileage was more than that which the odometer had recorded or which the previous owner had certified.
 
 
 29
 Senate Report at 3971-72.
 
 
 30
 Congress clearly wanted each transferor to prepare as accurate a disclosure statement as possible, even if the person had no role in odometer tampering. If OAA's argument that it cannot be liable under the Act were adopted, OAA could routinely process cars and give out mileage disclosure statements which, in the exercise of reasonable care, OAA knew were false. Such a practice would be at odds with the Act's purpose of getting as much information to the consumer as possible about a vehicle's mileage. Congress did not limit liability to the odometer tamperers and their cohorts.
 
 
 31
 Our interpretation of the Act, as it relates to an auto auction company which briefly holds title, is shared by the only other court which, to the best of our knowledge, has addressed the issue. Kantorczyk v. New Stanton Auto Auction, 433 F.Supp. 889, 892-93, 894 (W.D.Penn.1977).
 
 
 32
 OAA cannot avoid the force of the extremely strong documentary evidence of ownership (it voluntarily placed itself in the chain of title) and the Congressional intent behind the Disclosure Act by saying that OAA was merely acting for the convenience of the customer. We recognize that when a seller acts for a customer's convenience, he often does so to increase sales. The desire to sell more cars at higher prices is no reason to exclude a party from the scope of the Act. Furthermore, even if OAA's motives were wholly altruistic, the regulations make clear that good-hearted transferors are included within the scope of the Act. The regulation defining transferor and transferee covers transfers by gift. 49 C.F.R. § 580.3.
 
 
 33
 In summary, the Act's intention of having each transferor give odometer information to the buyer, together with extremely strong documentary evidence of ownership which OAA voluntarily created, leads us to the conclusion that OAA's brief retention of title of the car makes it a transferor and a transferee under the Motor Vehicle Information and Cost Savings Act.
 
 B. Intent to Defraud
 
 34
 Section 1989(a) of Title 15 allows a civil action against "[a]ny person who, with intent to defraud, violates any requirement imposed under this subchapter ...." OAA argues that it did not give the inaccurate mileage information with an intent to defraud.
 
 
 35
 OAA concedes that it violated § 1988 if it was a transferor or transferee. The legislative history to that section makes it clear that a party must use "reasonable care" to assure the accuracy of odometer disclosure statements. The Senate Report states: "[T]he auto dealer with expertise now would have an affirmative duty to mark 'true mileage unknown' if, in the exercise of reasonable care, he would have reason to know that the mileage was more than that which the odometer had recorded or which the previous owner had certified." Senate Report at 3971-72. Nevertheless, OAA can be civilly liable only if its violation of § 1988 was done with the intent to defraud. Ryan v. Edwards, 592 F.2d 756, 761 (4th Cir.1979); Nieto v. Pence, 578 F.2d 640, 642 (5th Cir.1978). The district court concluded that OAA did have an intent to defraud. This factual finding may be rejected by us only if it is clearly erroneous. Horner v. Mary Institute, 613 F.2d 706, 713 (8th Cir.1980).
 
 
 36
 The wrongdoer's intent to defraud is ordinarily proved by circumstantial evidence. All the cases we can find dealing with the Disclosure Act have been willing to infer an intent to defraud where the seller had actual knowledge that an odometer disclosure statement was false. See, e.g., cases cited in Nieto, 578 F.2d at 642. Both federal appeals courts which have considered the issue of intent to defraud and most district courts which have considered the issue have been willing to infer an intent to defraud where the seller exhibited gross negligence or a reckless disregard for the truth in preparing odometer disclosure statements. Ryan, 592 F.2d at 762; Nieto, 578 F.2d at 642 and district court cases cited therein.
 
 
 37
 The approach taken by the great majority of courts is sensible. If a person violates an odometer disclosure requirement with actual knowledge that he is committing a violation, a fact finder can reasonably infer that the violation was committed with an intent to defraud a purchaser. Likewise, if a person lacks knowledge that an odometer disclosure statement is false only because he displays a reckless disregard for the truth, a fact finder can reasonably infer that the violation was committed with an intent to defraud a purchaser. The inference of an intent to defraud is no less compelling when a person lacks actual knowledge of a false odometer statement only by "clos[ing] his eyes to the truth." Nieto, 578 F.2d at 642.
 
 
 38
 The district court inferred an intent to defraud on OAA's part because it evidenced a reckless disregard for preparing an accurate odometer statement. The court acknowledged that there was no evidence that OAA had actual knowledge the odometer reading on the Nova was wrong. However, the court found two items which led it to conclude that OAA was acting with a reckless disregard for the truth. First, OAA ignored the alteration of the mileage figure on the Kansas title. The district court said the erasure was clear and apparent. Our own examination of the title leads us to the same conclusion. The district court reasonably inferred that the failure to investigate in the face of an obvious change on the title was due to an intent on OAA's part to defraud the purchaser.
 
 
 39
 The district court's inference of a fraudulent intent is buttressed by the second item which the district court believed showed a reckless disregard for the truth--the method by which OAA prepared the odometer disclosure statements. OAA filled in Studna's disclosure statement to OAA. Studna had signed the statement in blank and OAA filled in the mileage simply by looking at the odometer. OAA made no effort to obtain any previous disclosure statements and it did not even try to find out if the car had already been driven over 100,000 miles. Also, the second disclosure statement filled out by OAA relied on nothing but the odometer reading. Because a car buyer can read an odometer the way OAA did, a disclosure form based solely on reading the odometer does nothing to give the car buyer additional information. OAA's method of compiling the disclosure statements shows a total disregard for the purposes of the Act. The district court could reasonably infer that OAA's disregard for making accurate disclosure statements stemmed from an intent to defraud purchasers. Kantorczyk, 433 F.Supp. at 893.[4]
 
 
 40
 When OAA's procedure for filling out the odometer disclosure statements is combined with its ignoring an altered title, the district court could reasonably find that OAA showed a reckless disregard for the truth. Therefore, we cannot call the district court's finding of an intent to defraud on OAA's part clearly erroneous.[5]
 
 III. Attorneys' Fees
 
 41
 The district court awarded roughly $12,000 in attorneys' fees upon a request for $27,000 and with a damages award of $1,500. The district court weighed a variety of factors, but it did not give sufficient consideration to the amount of money involved in the case. We feel that an $8,000 attorney fee award is the largest that should be allowed in this case.
 
 
 42
 The authority for the attorney fee award is found in § 1989(a)(2): "Any person who, with intent to defraud, violates any requirement imposed under this subchapter shall be liable ... [for] reasonable attorney fees as determined by the court." The question is what is a "reasonable" attorneys' fee in this case does pose some difficulties. The district court used the proper criteria for determining a reasonable attorneys' fee. It looked at the twelve factors listed by the Fifth Circuit for determining reasonable attorneys' fees. Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir.1974). Cf. Hensley v. Eckerhart, --- U.S. ----, ----, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40, 48 (1983) (Johnson factors apply to award of attorneys' fees under 42 U.S.C. § 1988). Johnson is the leading case for court determinations of reasonable attorneys' fees. S. Nahmod, Civil Rights and Civil Liberties Litigation § 1.20, at 30 (1979); Berger, Court Awarded Attorneys' Fees: What is "Reasonable"?, 126 U.Pa.L.Rev. 281, 285 (1977). We have approved of the use of the Johnson factors to determine a reasonable fee under § 1989(a). Duval v. Midwest Auto City, Inc., 578 F.2d 721 at 725, 725 n. 6 (8th Cir.1978).
 
 
 43
 The Johnson factor with which we are most concerned here is the amount involved and the results obtained. See also Hensley v. Eckerhart, --- u.s. ----, ---- - ----, ----, 103 s.ct. 1933, 1937-38, 1942-43, 76 l.ed.2d 40, 48-9, 54 (the amount involved and the results obtained indicates level of plaintiffs' success, which is a crucial factor in determining the proper amount of an award of attorneys' fees under 42 U.S.C. § 1988). The district court decided that this factor would "not weigh heavy in the determination of a proper and fair attorney fee" because the purpose of the Disclosure Act is to encourage prosecution in the face of small recoveries. It is true that the Act is intended to encourage private civil actions. This is reflected by a treble damages remedy in addition to the attorneys' fees. This Congressional intent is also evidenced by the legislative history to 1976 amendments to the Act. Congress expanded the authority of the Secretary of Transportation to deal with odometer tampering, in part because of dissatisfaction with the number of private civil actions that had been brought. S.Rep. No. 155, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code & Ad.News, 1718, 1719, 1723. And we have observed that "in many situations, the amount of damage under the Act will be so small that few attorneys will pursue his client's case with diligence unless the amount of the fee be proportionate to the actual work required, rather than the amount involved." Duval, 578 F.2d at 726.
 
 
 44
 Nevertheless, the amount involved and results obtained factor deserves a more weighted consideration. In Duval we recognized that there can be a disparity between the damages and the attorneys' fees. In Duval there were $3,960 in damages and $14,205.65 in attorneys' fees. But we emphasized: "[W]e do not minimize the significance of the amount of recovery as a factor in determining the reasonable value of an attorney's services.... [A] showing that the trial court's award exceeds the amount of damages does not, standing alone, amount to an abuse of discretion." Id. at 727. As Duval suggests, there must be some relationship between the amount involved and the attorneys' fees. Undoubtedly the Disclosure Act allows for fees to exceed damages. But $12,000 in fees is too far out of proportion to the $1,500 award to be considered reasonable. Even in Duval, which had the highest reported attorneys' fee award, the proportion between the fee and the damages (3.5 to 1) is not as out of proportion as the fee award in this case. (8 to 1).
 
 
 45
 Another Johnson factor is helpful in assessing the fee award in this case: awards in similar cases. Duval is the only case in which the attorneys' fees award was as high as the award in this case. Duval involved more than violations of the disclosure provisions of § 1988. It also involved odometer tampering (§ 1984) and conspiracy to tamper with odometers (§ 1986). Duval, 578 F.2d at 724. Also, plaintiffs' attorneys in Duval investigated over two hundred separate automobile transactions to support the conspiracy charge. Both the district court and our court agreed that such investigation was necessary to plaintiffs' case in Duval. Id. at 726. The Tusas' claim was far less complicated because there was neither a need nor an attempt to establish a conspiracy in this case. The greater complexity of Duval is also evidenced by the result. In Duval damages totaled $3,960. In the instant case plaintiffs were unable to show any actual damages, so the $1,500 statutory minimum was awarded. The court below overlooked the significance of the extraordinary circumstances in Duval when it considered awards in similar cases.
 
 
 46
 All other reported cases we can find which have been brought under the Act involved substantially lower fees than what the district court awarded to the Tusas. Four of the highest reported attorneys' fees awards under the Disclosure Act other than Duval can be found in the following cases: Gonzales v. Van's Chevrolet, 498 F.Supp. 1102, 1103, 1106 (D.Del.1980) (fee of $9,000 and damages of $7,105.98); Shore v. J.C. Phillips Motor Co., 567 F.2d 1364, 1365 (5th Cir.1978) (fee of $2,000 and damages of $3,000); Kirkland v. Cooper, 438 F.Supp. 808, 812 (D.S.C.1977) (fee of $2,000 and damages of $2,123.70; summary judgment); Jones v. Fenton Ford, 427 F.Supp. 1328, 1330 (D.Conn.1977) (fee of $1,200 and damages of $3,521.70).
 
 
 47
 We can find only one federal appellate case which looked unfavorably on an attorneys' fees award under the Disclosure Act because it was too low. In McGinty v. Beranger Volkswagen, 633 F.2d 226 (1st Cir.1980), the district court awarded fees of $3,000 with damages of $5,779. The First Circuit vacated the award for a fuller explanation of why the district court rejected plaintiffs' $17,000 fee request. Id. at 227, 231-32. Even in this case the First Circuit pointed out that the district court did not necessarily err in scrutinizing what was actually accomplished by way of damages as a result of counsels' efforts. Id. at 232.
 
 
 48
 We do not mean to suggest that a simple recitation of other fee awards under the Disclosure Act puts a cap on an award in a specific case. However, the comparison does give some indication of an appropriate fee under the Act. The survey of the fees shows that a $12,000 award for the minimum damages is far out of line when compared to other awards under the Act, even when inflation is taken to account for the other cases. The comparison of the Tusas' case with other awards under the Act buttresses the conclusion that the fee award in this case is too far out of proportion with the damages to be upheld. When we consider the result in this case and awards in similar cases, we find that $8,000 is the maximum fee award we will uphold in this case.[6]
 
 
 49
 Accordingly, the part of the judgment relating to attorneys' fees is reversed and the case is remanded to the district court for the limited purpose of amending the judgment to make the attorneys' fees award $8,000. The rest of the judgment is affirmed.
 
 
 
 [1]
 The Honorable C. Arlen Beam, United States District Judge, District of Nebraska
 
 
 [2]
 OAA does not attempt to defend itself on the basis that there is no privity between it and the Tusas. Such an argument would be unavailing. We agree with the Fourth Circuit that privity is unnecessary between the defrauded party and the party that violated the Disclosure Act with an intent to defraud. Ryan v. Edwards, 592 F.2d 756, 761-62 (4th Cir.1979). Section 1989(a) imposes liability on "[a]ny person" who violates a requirement of the Disclosure Act with the intent to defraud
 
 
 [3]
 The July 12 disclosure statement listing OAA as transferor would not be persuasive evidence because that form was signed by Studna, who was not an OAA agent
 
 
 [4]
 Taking action other than reading odometers will not impose an unreasonable burden on OAA. OAA would be liable only in situations where it is a transferor or a transferee. According to OAA, it rarely puts itself in the chain of title
 
 
 [5]
 The district court and some other courts have said that "constructive knowledge" of the inaccuracy of a mileage statement is grounds for inferring an intent to defraud. We have avoided use of that phrase because constructive knowledge can be defined as knowledge which one would acquire in the exercise of reasonable care. Black's Law Dictionary 284 (rev. 5th ed. 1979). The failure to exercise reasonable care might not alone allow a fact finder to infer an intent to defraud. However, the district court's use of the phrase "constructive knowledge" in this case does not undermine our decision because the district court found that OAA's conduct evidenced a "reckless disregard for the purposes of the Act."
 
 
 [6]
 The Tusas complain of the way in which the district court used the Johnson factors. The court used those factors to reduce the hourly rate to an amount below that which the district court considered reasonable. The court multiplied this lower rate by the number of hours it felt were reasonably expended and came up with $11,926.40. Had the district court used the hourly rates it considered reasonable, the lodestar amount would have been $21,385.25. We feel the district court should have used the rate it considered reasonable to reach the lodestar amount and then used the Johnson factors to adjust the lodestar amount or else used the Johnson factors to determine the reasonable number of hours devoted to the case. There was no need for the district court to reconsider its award in this case because the results obtained and awards in similar cases factors operate to limit the award to $8,000, regardless of which lodestar figure we use